UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
: 
THE NEW YORK STATE NURSES :
ASSOCIATION, :
: 
                               Plaintiff, :   Index No. 1:19-cv-01265 (FJS/CFH)
:
     - against - :
:
ALBANY MEDICAL CENTER, :
:
                           Defendant. :
:
------------------------------------------------------------------ x

## COMPLAINT

      The New York State Nurses Association ("NYSNA"), by its undersigned attorneys, for its complaint against Albany Medical Center ("AMC" or the "Company") states as follows:

## INTRODUCTION

      1.    NYSNA brings this action for injunctive and declaratory relief on behalf of the Filipino nurses that it represents who work at AMC under the terms of an individual contract that violates the forced labor provisions of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.*

      2.    AMC has recruited 582 nurses in the Philippines to migrate to the United States and work as registered nurses at AMC.  In order to enter AMC's program, however, those nurses—who make as little as approximately $50,000 per year before taxes—must sign a contract obligating them to immediately pay up to $20,000 to AMC should they resign their employment within three years of their start date.  The contract that these immigrant nurses must sign in order to obtain employment and come to the United States threatens that AMC will seek to automatically enter judgment without so much as a lawsuit should they resign and fail

1

immediately to pay AMC. AMC also threatened to report the nurses to immigration authorities and/or subject them to deportation if they broke their contracts. Such threats of serious financial and other harm to recent immigrant nurses renders their service at AMC for the first three years of their employment involuntary and is just the type of worker exploitation that the forced labor provisions of the TVPA are designed to prevent.

## JURISDICTION AND VENUE

3. This court has jurisdiction over the present action under 28 U.S.C. §§ 1331 and 1337 because this case arises under the TVPA, a federal statute that affects interstate commerce.

4. Venue properly lies in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to plaintiff's claims occurred in this judicial district, defendant AMC is headquartered in and does business in this district, and NYSNA maintains an office in this judicial district.

## PARTIES

5. NYSNA is New York State's largest labor union and professional association for Registered Nurses ("RNs"). It is the certified collective bargaining representative for the more than 1,900 registered nurses employed by AMC.

6. NYSNA represents and protects the interests of AMC's registered nurses in connection with the terms and conditions of their employment at AMC.

7. Defendant AMC is a New York corporation with its principal place of business located at 43 New Scotland Avenue, Albany, New York 12208, where it operates an acute care hospital and medical college.

## FACTUAL ALLEGATIONS

**The Philippine Recruitment Program**

8. On information and belief, AMC started what is now known as the Philippine Recruitment Program (the "Program") in or about 2002.

9. Pursuant to the Program, due to labor shortages in the United States, AMC actively recruited nurses that resided in the Philippines to migrate to the United States and work as registered nurses at AMC.

10. Through September 24, 2019, AMC has recruited and employed 582 registered nurses through the Program.

11. A spokesperson for AMC has stated that AMC created its program because "We were aware that in the Philippines there are a number of well-trained nurses looking for work [and they are] fluent in English."

12. AMC maintains an "AMC Recruitment Team" that recruits nurses for the Program in the Philippines and conducts interviews of the nurses in the Philippines.

13. AMC partners with 1st Northern International Placement Incorporated, a Philippines-based recruitment agency, to recruit the nurses.

14. Nurses also attend both an open house/interview and an orientation session in the Philippines at which both AMC and 1st Northern personnel attend and explain information about the Program. AMC personnel attending these programs have included Lynne Longtin, AMC's former Patient Care Service Director, and Wendy Press, AMC's Recruiting Coordinator and Director of the Program.

15. At the open house and/or orientation, AMC and 1st Northern personnel review the terms of the contract the nurses must sign to join the Program (further described in detail below), including the Forced Labor Penalty Provision (defined below). The presenting

3

staff have explicitly labeled this provision as a "penalty" for when a nurse breaks the contract.

16. During at least one open house, Press also informed the nurses and/or left the impression that if they broke their contract they could be deported from the United States. On information and belief, whether at the open house, or during orientation, or otherwise, AMC personnel have wrongly informed other nurses in the Program that if they broke their contract they could be deported or otherwise jeopardize their immigration status.

17. AMC facilitates the process by which Program nurses obtain EB3 Permanent Resident Visas. The EB3 visa is visa preference category for United States employment-based permanent residency intended for "skilled workers" and "professionals" such as registered nurses.

18. When the nurses first arrive in the United States, AMC provides them with temporary housing (the cost of which is deducted from their paychecks). There are two locations in Albany, one on Dana Avenue and the other on Morris Street, both of which are narrow row houses split into separate dwellings on the first and second floors. AMC has housed up to 12 nurses, both male and female together, per house. Due to security issues concerning the locations of these houses, AMC provided the nurses with whistles that they could blow in the event that they were attacked. Also due to the security concerns, AMC security personnel drove them to and from their shifts at AMC.

**The Forced Labor Penalty Provision**

19. After AMC recruits a Filipino nurse, it presents them with a non-negotiable standard contract that they must sign in order to become part of the Program (the "Individual Employment Contract").

20. The most recent iteration (in 2017) of the Individual Employment Contract

4

sets forth the nurses' starting rate of pay and other terms of employment. As of 2017, the minimum starting rate of pay was set at $23.25 per hour (which has increased from $18.25 per hour as recently as 2012). With respect to the visa process, it notes that any "contingency not met or any failure on your part to cooperate invalidates the offer and all other aspects of the offer."

21. The Individual Employment Contract later enumerates certain "Placement Fees" that "AMC Pays For." Those fees are employment agency fees, attorney fees, testing application fees, CGFNS Credential Verification application fees, drug testing fees, transportation, visa screen, I-140 filing, departure immigration fee (greencard), AMC Recruitment Team recruitment efforts ("portion of room, board, travel, salary, etc."), RN Licensure application fee, and cash advancement on arrival (of $500.00).

22. The Individual Employment Contract provides that AMC "agrees to pay the costs (placement fees) associated with your coming to AMC to become a NYS licensed RN estimated to be $20,000, including but not limited to the placement fees" described above.

23. The contract goes on to state that AMC will cover the Placement Fees "in consideration for your agreement to render thirty-six (36) months of consecutive employment" at AMC as a registered nurse.

24. However, the next section of the contract (the "Forced Labor Penalty Provision") outlines the consequences of the failure of the nurse to work at AMC for the full 36-month period.

25. It provides that the nurse "will immediately repay the placement fees incurred by AMC in accordance with [the next paragraph], upon the occurrence of termination of your full-time employment at the Albany Medical Center for cause or upon your resignation

5

prior to the completion of the requisite number of consecutive months of employment as a" registered nurse.

26. If the registered nurse resigns (or is fired for cause) during the first 10 months of employment, the "$20,000 in placement fees will convert to a loaned amount of money and shall become due."

27. If the nurse resigns during their 11th through 20th month of employment, $15,000 of the placement fees is converted to a loan and is immediately due.

28. If the nurses resigns during their 21st through 36th month of employment, $10,000 of the placement fees is converted to a loan and is immediately due.

29. Only if the nurse works for 36 consecutive months does AMC discharge the debt (absent forgiveness for death or permanent disability).

30. If a nurse resigns before their 36th month, then pursuant to the Individual Employment Contract, AMC "may pursue all available legal and equitable remedies to effectuate repayment upon default by you."

31. The Individual Employment Contract deems itself to be an "affidavit for confession of judgment," and states that the nurse "consent[s] to the entry of judgment by confession, in the country in which you then reside[.]"

32. Moreover, it provides that if AMC "establishes facts demonstrating your failure to repay amounts owed AMC under this agreement may constitute fraud, AMC may report your failure to make restitution to the Bureau of Citizenship and Immigration Services under applicable immigration fraud statutes."

33. On information and belief, the $20,000 penalty is disproportionate to the actual costs incurred by the AMC, is disproportionate to the compensation paid to the nurses in

the Program, and does not reasonably measure AMC's anticipated harm in the event of a breach, which, in any event, would be ascertainable in the event of a breach.

34. The Forced Labor Penalty Provision and confessions of judgment are designed to coerce these recently-arrived immigrant nurses into continuing employment with AMC.

35. AMC has enforced the Forced Labor Penalty Provision against nurses in the Program who resigned prior to completion of their three-year term.  In one instance, for example, AMC enforced the Forced Labor Penalty Provision and the nurse paid AMC $10,000 as she was between her 21st and 36th month of employment but resigned to return to the Philippines.  On information and belief, AMC has enforced the Forced Labor Penalty Provision with respect to other nurses who resigned from the Program as well.

36. Nurses in the Program who have desired to resign have not done so due to their inability to comply with the Forced Labor Penalty Provision and/or fear of being reported to the Bureau of Citizenship and Immigration Services.

37. For example, AMC assigned one nurse—who has been a registered professional nurse for 12 years with significant critical care experience and a post-graduate education—to a non-critical care unit (a medical-surgical unit) that was not her specialty.  She asked Wendy Press (AMC's Recruiting Coordinator and Director of the Program) to assign her to her area of specialty after she became aware that there were many available slots at the Medical Intensive Care Unit, the Coronary Care Unit, and the Surgical Intensive Care Unit.  Press agreed to place her in a critical care unit, but on her first day of employment she discovered that AMC placed her on the medical-surgical floor instead.  She is still in her first year under the Contract and requested that she be moved to a critical care unit in light of her

expertise.  AMC refused, citing the term of the Individual Employment Contract, which gives AMC complete discretion on unit assignments during the first year and does not permit the nurse to even apply for a change in assignment until completion of that year.  Press explained to her that either she could wait until the conclusion of her first year to apply for a transfer, or she could choose other options like leaving AMC—but Press did not want that to happen and if the nurse did leave she would be in breach of the Individual Employment Contract and have to pay AMC $20,000.

38. The same nurse was also only paid $27.80 per hour even though an American nurse colleague on a medical-surgical floor had just received an associate's degree and was in her first year as a nurse was paid $34.00 per hour.  Due to these issues—including AMC not recognizing and valuing her years of experience and expertise, and her national certification in Critical Care—this nurse desired to resign from the Program but has not done so because she cannot afford to pay the $20,000 that she would immediately owe to AMC should she resign.

39. Another nurse wanted to resign because a friend from her church that worked as a nurse for a nursing home in Nanuet, New York, was earning $35 per hour, whereas she was only earning $28.50 per hour at AMC.  She also had a four-year old child and a spouse with a disability, and had an aunt that lived in Nanuet who could assist with the care of the child.  She, therefore, urgently wanted to resign and move to Nanuet and find work as a nurse there.  She did not, however, because of fear of the repercussions of breaking her contract.  Not only could she not afford the amount she would immediately need to pay to AMC, but at her orientation in the Philippines she was informed by Press that if she broke her contract, she could be deported.

40. Another nurse (who is a single mother) wanted to resign after AMC

refused to promote her and increase her salary and used the excuse that her contract prohibited them from doing so (which is not true).  She desperately needed the pay increase because her children had arrived in the United States.  She also wanted to be closer to her family who live in New York City.  She too, however, has been unable to resign due the inability to repay the (now) $10,000 she immediately would need to repay to AMC.

41. Additionally, in a letter from AMC's Philippine Recruitment Team in February 2010, AMC sought to address "additional concerns and questions" about "Foreign Recruitment."  AMC presented this letter to the immigrant nurse at the same time it provided the nurse with the Individual Employment Contract.

42. In a subsection entitled "Breaking Contracts," the letter states that the "offer letter you sign to accept employment at Albany Medical Center is a legal document and requires obligations and fulfillments from both parties.  There will be no negotiation over the amount due (US Dollars) when someone breaks their contract.  The amount is payable prior to the last day of employment."

43. The letter continues that "the breach of your contract may necessitate our reporting your breach to the Bureau of U.S. Citizenship and Immigrations Services," and "will make you 'Not Recommended for Re-Hire.'"

44. The letter also notes with respect to unit assignments that there "will be no choice regarding unit assignment or shift preference.  You will be placed according to patient care and hospital operation needs."

45. The letter concludes:  "If there are any questions regarding your ability to fulfill your contract obligations, please do not stay for the remainder of the interview or sign the agreement.  In order for Albany Medical Center to successfully continue our Foreign

9

Recruitment Program, we must enforce the above stipulations."

46. AMC has also required other nurses to sign a letter at their orientation in the Philippines, on AMC letterhead, purportedly on behalf of the nurse to, *inter alia*, Longtin and Press.

47. In that letter, which AMC drafted, the nurse is required to "reaffirm my appreciation for all the help and support" that AMC has "extended to me in my dream to go to America." The nurse must affirm that she is making the statement "voluntarily because I believe it is a fair thing to make and because my honest intent is to go to Albany Medical Center and show my appreciation for giving me this chance of a life time for me and my family."

48. In discussing the nurse's commitment to AMC, the letter states that "as a gesture of my gratitude," if for "any reason I fail to fulfill my commitment I will have committed not only a serious breach of my promise but also committed an act of misrepresentation about my intent to come and work for you."

49. Then, in bold, the letter states: "I also understand that such a breach will enable AMC to either report my misrepresentation and fraudulent act" to immigration authorities and to "collect from me the sum of twenty thousand dollars … in reimbursement for all expenses incurred on my behalf and expenses it will incur to seek to replace me, or both."

50. This letter preyed upon what is known as a "debt of gratitude." In Filipino culture, imposition of financial debt on an individual creates a "debt of gratitude" on the debtor. The "debt of gratitude" creates significant shame among debtors of Filipino culture who are not able to repay the creditor. In certain parts of the Philippines, and particularly in rural parts (where most of the recruited nurses are from), owing a debt creates a significant responsibility. Debtors often feel that failure to pay a debt will displease not only the creditor, but will also

cause dishonor to the debtor and his or her family. AMC attorney Patrick Page, who accompanied the recruitment team in the Philippines, was aware of the cultural implications of the debt because he is also Filipino. AMC was able to use the threat of failure to repay debt to coerce and control RNs in the Program.

51. In light of the facts set forth above, the immigrant nurses in the Program and subject to the Forced Labor Penalty Provision reasonably fear serious financial, psychological, and/or reputational harm if they do not continue working for AMC.

**The Status of the Program**

52. The last time AMC conducted interviews in the Philippines was in February 2017.

53. There are still sixteen new hires through the Program who are awaiting immigration priority dates and arrival in the United States to begin work at AMC under the terms of the Individual Employment Contract.

54. Since January 1, 2019, twenty nurses have begun (and are still) working at AMC pursuant to the Program and under the terms of the Individual Employment Contract. Another thirty-six started in 2018, and thirty-three in 2017.

55. AMC states that they do not "foresee offering additional contracts of this nature, however if business needs dictate such a program is necessary due to a limited talent pool within the United States, we may revisit the need."

**NYSNA Wins Union Election**

56. Prior to 2018, the registered nurses at AMC were not represented by any union.

57. On or about March 16, 2018, NYSNA petitioned the National Labor

Relations Board ("NLRB") to conduct an election to determine whether the RNs at AMC desired NYSNA to be certified as their collective bargaining representative.

58. If NYSNA prevailed in the election, the nurses in the Program would be included in the bargaining unit and NYSNA would represent them.

59. During the election process, AMC representatives made numerous representations concerning the Program.

60. In a letter dated April 3, 2018, Longtin (AMC's former Patient Care Service Director) wrote to the nurses in the Program stating that the "things you have dreamt about while still in the Philippines have come true because of the AMC Philippine Recruitment program. You have been able to reap the benefits of bringing your loved ones (spouses, children, parents, siblings) to the United States. You are able to send dollars back home to provide more for your family. I am sincerely hoping that everyone is becoming well informed and thinking about the consequences of the decision that is about to be made" about whether to vote for NYSNA. Longtin's letter closed: the "legacy of the Philippine RN at AMC, it is in your hands."

61. Press wrote on an AMC Facebook page that, should NYSNA win the election, "the ability of the Philippine Recruitment team to help you might be limited, and our continued success to recruit your family and friends back in the Philippines may not happen."

62. NYSNA prevailed in the NLRB-conducted election.

63. On April 23, 2018, the NLRB certified NYSNA as the exclusive collective bargaining representative for the AMC RNs, including those RNs in the Program.

64. NYSNA currently represents eighty-four nurses in the Program who are working under the terms of the Individual Employment Contract.

## COUNT I

### (TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT: FORCED LABOR)

65. NYSNA re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

66. 18 U.S.C. § 1595 provides for a civil action against the "perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)" for violations of, *inter alia*, 18 U.S.C. §§ 1589 and 1590.

67. AMC violated 18 U.S.C. § 1589(a) by knowingly obtaining and providing the labor and services of RNs in the Program by, among other things, threats of serious financial, psychological, and/ or reputational harm that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or continue performing labor or services in order to avoid incurring that harm.

68. AMC operated a scheme, plan or pattern intended to cause the RNs in the Program to believe that non-performance of labor would result in serious financial, psychological and/or reputational harm in order to exert pressure on the nurses to continue working for AMC and refrain from seeking employment elsewhere.

69. AMC also violated 18 U.S.C. § 1590 by knowingly recruiting, providing, or obtaining any person for labor or services in violation of 18 U.S.C. § 1589.

### PRAYER FOR RELIEF

Wherefore, NYSNA respectfully requests that the Court issue a judgment:

(a) Declaring the Forced Labor Penalty Provision, including the confessions of judgment, to be unlawful under the TVPA;

(b) Enjoining AMC, their agents, representatives and employees from continuing such policy and practice of enforcing the Forced Labor Penalty Provision, including the confessions of judgment;

(c) Awarding NYSNA the costs of this action and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1595 and 1964; and

(d) Granting such other relief as is just and proper.

Dated: New York, New York
      October 15, 2019

          Respectfully submitted,

          COHEN, WEISS AND SIMON LLP

          By: _____
          Joseph J. Vitale
          Evan Hudson-Plush
              *(application for admission pending)*
          Marie B. Hahn
              *(application for admission pending)*
          **COHEN, WEISS AND SIMON LLP**
          900 Third Avenue, Suite 2100
          New York, New York 10022
          Telephone: (212) 356-0238
          Facsimile: (646) 473-8238
          jvitale@cwsny.com

          *Attorneys for the New York State Nurses Association*